UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| JESSE WAYNE FALLIN, JR., | Case No. 3:23-cv-00512-ART-CLB |
| Plaintiff, | Findings of Fact and Conclusions of Law |
| v. | |
| UNITED STATES, et al., | |
| Defendants. | |

## I.    BACKGROUND

Plaintiff Jesse Wayne Fallin ("Fallin") hit a United States Postal Service ("USPS") van while driving near Fernley, Nevada. Fallin sued the United States for his medical damages, pain and suffering, and lost wages. Both parties presented argument and testimony in a five-day bench trial before the Court.

In its closing, the Government conceded duty, breach, causation, and damages up to the medical treatment that Fallin received between the start of the accident and April 26, 2021. The Government also conceded that all medical care provided to Fallin fell within the standard of care. The Government contested comparative fault, proximate and legal cause for spinal procedures that had serious complications, and medical and economic damages after April 26, 2021. The Court addresses facts and law relevant to these questions as required by Federal Rule of Civil Procedure 52(a). Any findings of fact set forth are findings of fact even if stated as conclusions of law, and any conclusions of law are conclusions of law even if stated as findings of fact.

## II.    FINDINGS OF FACT

On January 30, 2021, Fallin hit a USPS van driven by Tyler Barnes ("Barnes"). Barnes had stopped at a stop sign on River Ranch Road before

1  attempting to turn left onto westbound US-50. He saw Fallin approaching, and
2  he turned further left to avoid a head-on collision. The right corners of both
3  cars collided, damaging both vehicles.

4      The Court first considers the factual issues regarding the accident,
5  including whether Fallin was traveling at an unreasonable rate of speed before
6  Barnes turned into his lane of traffic and whether Fallin attempted to reduce
7  his speed before hitting Barnes. It then considers whether Fallin's damages
8  were caused by the accident or independently caused by an unrelated 2018
9  accident. It then considers whether Fallin's medical treatment was a natural
10 and probable consequence of the accident. It then considers whether Fallin's
11 medical treatment arose out of secondary gain. It then considers whether Fallin
12 suffered economic damages, past pain and suffering, and future pain and
13 suffering.

14      **A.    Fallin Had No Fault in the Underlying Car Accident.**

15      In light of the testimonies of the three witnesses to the accident—Barnes,
16 Fallin, and Fallin's wife Stephanie—Barnes was entirely at fault in the
17 underlying accident.

18      Fallin did not have reason to expect that Barnes would turn onto US-50
19 when he did. Fallin credibly testified that he saw Barnes stopped at a stop sign
20 around one hundred yards away. Fallin credibly testified that Barnes turned
21 into the road before he had time to avoid a collision. (ECF No. 53 at 17.) Barnes
22 credibly testified that Fallin's vehicle was in Barnes's blind spot as he turned,
23 and he admitted fault for the accident. (ECF No. 54 at 77–78.) Officer Knoch, a
24 police officer who arrived on the scene after the accident, issued Barnes a
25 citation for turning when Fallin had the right of way. (*See id.* at 174:23–175:5.)
26 He did not issue Fallin a citation. (*Id.*)

27      Fallin was not driving unreasonably fast when he hit Barnes.  The speed
28 limit on River Ranch Road was sixty-five miles per hour. Fallin credibly

testified that he was driving at or around the speed limit when he first saw Barnes stopped at the stop sign on River Ranch Road, around 100 yards away. Fallin's wife, Stephanie, credibly testified that modifications for off-roading made to the Fallins' Chevy Tahoe prevented the vehicle from reaching a speed much beyond sixty-five miles per hour. (ECF No. 53 at 205:16–206:1.) An intake form from the emergency room later that day, based on an interview with Fallin, recorded that Fallin was "traveling approximately 70 miles per hour" before the accident. (*See* ECF No. 53 at 72:5–25.) Fallin and Stephanie testified, though, that they were driving at or below the speed limit before Barnes turned onto US-50. The Court finds that Fallin and Stephanie's testimony that they were traveling around the speed limit more credible than the intake form from the emergency room, which itself acknowledges that Fallin provided an approximation. Fallin was not driving unreasonably fast before the accident.

Fallin made reasonable efforts to avoid the accident. Fallin had been traveling at approximately forty-five miles per hour at the time of the incident, according to Officer Knoch's estimate based on surveying damage to the vehicles at the scene of the accident. (*See* ECF No. 53 at 68:16–21.) The Court also finds credible Officer Knoch's testimony that he would have found Barnes at fault even if Fallin had been driving seventy miles per hour upon seeing Barnes one hundred yards away, because Barnes "did pull out in front of" Fallin. (ECF 54 at 176:16-21.) Considered together with Fallin's testimony that he was driving around the speed limit when he saw Barnes, Knoch's testimony further supports finding that Fallin attempted to slow down before hitting the postal van, and Barnes was entirely at fault.

### B.    Fallin's Damages Were Caused by the Accident.

The factual issues to resolve regarding causation between the accident and Fallin's injuries are whether Fallin suffered any injury due to the accident,

1    whether Fallin's injuries arose instead out of a 2018 rollover accident and were

2    independent to the accident in 2021, and whether Fallin's injuries were

3    causally connected to his decision to seek medical treatment after the accident.

4              **1. Fallin's Injuries Were Not Solely Caused by a 2018 Accident.**

5        In 2018, more than two years before the accident at issue in this case,

6    Fallin suffered a serious accident in which he did not seek extensive medical

7    care. The Government argues that the 2018 accident, and not the 2021

8    accident, caused Fallin's injuries.

9        The 2021 accident was either the sole cause or a substantial

10   contribution to Fallin's eventual injuries. Fallin's injuries arose shortly after

11   the 2021 accident, and Fallin and his friends and family credibly testified that

12   he did not have severe back pain before the 2021 accident. (*See* EFC No. 56 at

13   143:17–144:5; 161:17–19; 164:15–20.)  No evidence conclusively shows that

14   Fallin's injuries arose only out of the 2018 accident. While the Government

15   points to facts suggesting that Fallin was drinking or using drugs before the

16   2018 accident and that he may have left a hospital after that accident against

17   medical advice, the Court finds that these facts do not undermine Fallin's

18   otherwise credible testimony that the 2021 accident caused him enduring

19   physical pain. Fallin's expert, Dr. Rappaport, testified that  the 2021 accident

20   may have worsened Fallin's injury from 2018. (*See* ECF No. 55 at 10:17–

21   11:17.) The Court finds Dr. Rappaport's testimony credible. Accordingly, the

22   Court finds it more likely that Fallin's injuries arose either solely out of the

23   2021 accident—or arose out of latent injuries from the 2018 accident

24   exacerbated by the 2021 accident—than the possibility that Fallin was only

25   injured in the 2018 accident.

26              **2. The 2021 Accident Caused or Contributed to Fallin's Injuries.**

27       The 2021 accident caused or contributed to the pain which required

28   Fallin to seek medical treatment from January 2021 onward. Fallin and

1  Stephanie credibly testified that Fallin hit the center console of his vehicle

2  during the collision. Fallin credibly testified that he told Officer Knoch at the

3  scene of the accident that he was experiencing back pain. Fallin and Stephanie

4  credibly testified that Fallin's pain got worse throughout the day, eventually

5  requiring Fallin to go to the emergency room that night, instead of going

6  forward with their plans to sled with their children and friends.

7      Fallin credibly testified that his pain increased throughout the day and

8  in the weeks that followed. The Government points out that several witnesses

9  who saw Fallin immediately after the crash testified that Fallin said he was

10  "fine" and did not appear to be in debilitating pain. (*See e.g.*, ECF No. 56 at

11  134:4–18.) These witnesses recalled Fallin answering that he was "OK,"

12  "alright," or "fine" after the accident, and Stephanie posted photos of the

13  accident on Facebook with the caption: "The important part is everyone is

14  okay." (ECF No. 53 at 210:17–22.) The Court interprets these statements, given

15  the seriousness of the accident, to mean that no one had died or been maimed

16  in the car crash.  These witnesses—including Officer Knoch, Tyler Barnes,

17  USPS supervisor Jackey Wagner, and friends of Fallin's family, Justin Gardner,

18  Savannah Murgia-Alarcon, and Chelsea Gardner—did not contradict Fallin and

19  Stephanie's testimony that Fallin's back and side hurt and that this pain

20  continued and got worse throughout the day. (*See* EFC No. 56 at 143:17-

21  144:5; 161:17-19; 164:15-20.) Finally, Plaintiff's expert Dr. Rappaport credibly

22  testified that a person who had just been in a serious car accident may not

23  immediately feel pain because of adrenaline or shock. (ECF No. 55 at 8:18–9:6.)

24

25  **C.  Fallin's Medical Treatment After April 26, 2021, Was a Natural and Probable Consequence of His Injuries from the Accident.**

26

27  The factual issues to resolve related to Fallin's medical treatment are

28  whether Fallin attempted conservative treatment before seeking surgery and

1  whether Fallin's discogram, lumbar fusion surgery, and other treatment arising

2  out of those procedures were proximately caused by the accident.

3      Fallin attempted conservative treatment for his back pain. He attended

4  either four or five of twelve prescribed physical therapy sessions before being

5  prescribed a discogram. Though reports from physical therapy documented

6  improvements in Fallin's condition, Fallin himself credibly testified that

7  physical therapy did not adequately reduce his pain. Fallin also received an

8  epidural injection and trigger-point injections as conservative treatment to

9  reduce back pain, and while Fallin reported that these were somewhat

10 effective, he credibly testified that these procedures failed to address pain over

11 time. Fallin's friend and occasional supervisor Justin Gardner credibly testified

12 that he knew that Fallin was in serious pain at work and assigned him lighter

13 tasks after the accident. Gardner testified that even with a reduced workload,

14 Fallin experienced pain beyond what he could tolerate while working.

15     Fallin's treating physicians decided to place Fallin on track for surgery

16 three months after the accident, which, while not as long as some doctors

17 might wait before undertaking an invasive surgery, was based on Fallin's

18 presentation of pain and inability to work. Fallin's expert, Dr. Rappaport,

19 testified that he typically recommends that surgery only be considered after six

20 months of conservative care. (ECF No. 55 at 84:19.) Dr. Jones, Fallin's treating

21 physician, however, credibly testified that he considered Fallin a candidate for

22 surgery after three months of conservative care because Fallin's pain kept him

23 from working. (*See* ECF No. 55 at 176:25–177:14.) Additionally, Dr. Jones did

24 not want to prescribe Fallin opioid painkillers, which Fallin and his wife also

25 wanted to avoid because of Fallin's past struggles with addiction. (*Id.* at 209;

26 *see* ECF No. 53 at 32:14.) Additionally, Fallin and his wife testified that Fallin's

27 pain kept him from working, doing household tasks, playing with his children,

28 and performing chores like gardening and mowing the lawn. (*See* ECF No. 53

1    at 34:12-35:1, 234.)

2        The discogram ordered by Dr. Jones on May 13, 2021, and performed by

3    Dr. Sullivan in June 2021 was a natural and probable consequence arising out

4    of the accident. According to Drs. Rappaport, Bjerke, Chavez, Goode, and

5    Jones, discograms are a controversial medical procedure that were widely used

6    in the early 2000s to isolate specific spinal discs before undertaking surgeries

7    to fuse spinal disks. Though use of discograms is now less widespread, some

8    practitioners still use the procedure. The Court lacks a sufficient evidentiary

9    basis to decide whether discograms are within the standard of care, and the

10   Court need not decide this to resolve the case.[1]

11       Dr. Jones's spinal fusion surgery, and all complications arising out of it,

12   were natural and probable consequences of the 2021 crash. Dr. Jones credibly

13   testified that he spoke with Dr. Sullivan, who worked in the same building,

14   about the results of Fallin's discogram. (*See* ECF No. 55 at 230:7–18.) Dr.

15   Jones fused Fallin's L3-4 disks on September 14, 2021, and Fallin experienced

16   complications—likely from anesthesia—which required an additional

17   emergency room visit. Months after the surgery, Fallin developed left-leg pain,

18   possibly due to the surgical route undertaken by Dr. Jones. Fallin also

19   underwent an MRI and radiofrequency ablations to address the newly

20   occurring pain, including treatment by Dr. Randall Goode, who credibly

21   testified as to the need for these additional procedures to address

22   complications from surgery. (*See* ECF No. 54 at 15–18.)  By 2022, Fallin had

23   returned to work and believed that the surgery and related procedures

24   _____

25   [1] Additionally, whether a discogram was properly performed is not a relevant
     question in this case. Nevada law holds that tortfeasors are responsible for
26   subsequent negligence proximately related to the original tort. *See Republic Silver*
     *State Disposal, Inc. v. Cash*, 478 P.3d 362, 365 (Nev. 2020) (permitting a tortfeasor
27   to indemnify itself via contribution). The correct procedure to challenge
     subsequent medical negligence is a cross-claim against the allegedly negligent
28   successive tortfeasor or to seek contribution following judgment.

1    addressed his back pain. (*See* ECF No. 53 at 41, 46.)

2

3    **D.    Fallin's Medical Care Did Not Arise Out of Secondary Gain or Medical Build-Up.**

4          The Court lacks a basis to find that Fallin faked pain to receive invasive

5    spinal surgery. In its closing, the Government argued that Fallin was engaged

6    in "secondary gain," meaning that he exaggerated symptoms in order to miss

7    work or obtain financial compensation. Fallin and his wife credibly testified

8    that Fallin was in severe pain following the car accident, and though Fallin was

9    hesitant about getting surgery, he credibly testified that he believed his

10   treating doctors when they said surgery would address the root cause of his

11   pain. Fallin's colleague and occasional supervisor Justin Gardner credibly

12   testified that he witnessed Fallin in pain before the surgery. Fallin's treating

13   physicians testified that they and their staff observed Fallin was in pain during

14   clinical encounters. (*See e.g.*, ECF No. 54 at 14:24-15:11; ECF No. 55 at 153:9-

15   17, 169:5-8.) The Government points to notes from physical therapy sessions

16   which recorded that Fallin was progressing and feeling less pain, but these

17   notes, which themselves contain copy-pasted summaries of Fallin's progress

18   and status, do not convince the Court that Fallin was engaging in secondary

19   gain. Several credible percipient witnesses testified to Fallin's pain in the weeks

20   following the accident. (*See* EFC No. 56 at 143:17-144:5; 161:17-19; 164:15-

21   20.) Dr. Jones also explained that despite some pain relief during treatment,

22   Fallin's pain symptoms were persisting, not improving, during this period.

23          Similarly, the Court lacks evidence to find that Fallin's lawyers directed

24   his treatment in order to maximize damages in this lawsuit. The sole evidence

25   allowing the Court to infer that Fallin's lawyers directed his treatment is a May

26   6, 2021, note in records from Tahoe Fracture saying that "Benson Bignham

27   [sic] called stating what is the next step for [Fallin]." (*See* ECF No. 53 at 149:8–

28

150:6; ECF No. 54 at 56:19–21.) The Government did not produce any witnesses who testified about Fallin's lawyers directing treatment or any scheme to artificially inflate Fallin's damages. Fallin's doctors credibly testified that a law firm operating as a payor for medical billings communicates with medical providers in the same way an insurance company would. (ECF No. 54 at 27–28, 34, 56–57.) The fact that Fallin received treatment based on medical liens instead of insurance does not by itself show that Fallin was receiving unnecessary care, and at least one of Fallin's treating doctors, Dr. Jones, credibly testified that he was not aware at the time he provided care that Fallin's source of payment was a lien. (*See* ECF No. 55 at 179–80, 195:12; *see also id.* at 275.) The Government did not provide evidence—beyond the statements of Government's counsel—showing a pattern or practice of inflated billing, law-firm-directed treatment, or diagnosis of unnecessary, medically unjustified procedures. (*See* ECF No. 57 at 162:5–11.) Without this sort of evidence, the Court cannot find that Fallin's lawyers directed him to unnecessary medical treatment or inflated costs.

> **E.    The Court Grants Plaintiff's Request for Medical Damages.**

Fallin seeks damages for special medical damages that he incurred and future medical damages for continued back pain stemming from the accident and subsequent care. The Court grants the request for special medical damages and future recommendations as follows:

(1) Medical Special Damages:

| | |
|---|---|
| Nevada Emergency Physicians | $1,266.00 |
| Northern Nevada Medical Center | $18,731.00 |
| The Swift Institute | $60,963.25 |
| Tahoe Carson Radiology | $1,375.00 |
| Fernley Physical Therapy, Inc. | $3,273.00 |
| Carson Tahoe Hospital | $90,368.31 |
| Ortho Spine and Rehab | $1,720.00 |
| Central Lyon County Fire Protection District | $3,340.32 |
| The Swift Institute – Spine Nevada MRI | $2,750.00 |
| James J. Lynch, MD, Ltd. | $34,943.00 |

| | |
|---|---|
| Sierra Regional Spine Institute | $800.00 |
| TOTAL | $219,529.88 |

(*See* ECF No. 55 at 63:21-67:24.)

(2) Future Recommendations:

| | |
|---|---|
| Selective Nerve Root Block | $7,600.00 |
| Sympathetic Branch Block | $10,000.00 |
| TOTAL | $17,600.00 |

(*See* ECF No. 55 at 68:1-7 and 68:24-69:9)

The Court finds credible Dr. Rappaport's testimony that these future treatments are medically necessary and reasonably related to Fallin's injuries from the accident.

## F.  Plaintiff's Economic Damages Expert Testimony Applies to Fallin's Economic Loss Claim.

Both parties offered economic analyses to estimate Fallin's economic damages from time spent not working. The Government's expert, Mr. Partin, stated that his analysis was based on expert reports from Drs. Chavez and Bjerke that found that Fallin should have been able to work within three months of the accident. Mr. Partin stated that he would be unable to estimate economic damages based on different assumptions. Fallin's expert, Mr. Simms, used a different methodology involving calculating Fallin's wages from his W-2s and applying that wage to the time he spent not working.

Mr. Partin's analysis depends on finding that Fallin would have been able to work within several weeks of the accident. Because the Court finds otherwise, and because Dr. Partin has not offered an expert analysis that takes into account the much longer period during which Fallin was unable to work, the Court is left with Mr. Simm's analysis. The Court finds Mr. Simm's analysis credible and adopts it. Accordingly, the Court finds the following for Fallin's

lost wages from the time he was unable to work due to the accident.

<u>Wage Loss:</u>                                                          $69,934.00
(ECF No. 54 at 135:17-22, 135:23-137:20)

## G.    Past Pain and Suffering

The Court finds that damages of Fallin's medical specials and wage loss multiplied by two sufficiently compensate Fallin for past pain and suffering.

<u>General Damages:</u>
Past Pain and Suffering                                       $614,127.76

## H.    There is No Award for Future Pain and Suffering.

The Court lacks a basis in the evidence to find future pain and suffering.

## III.    CONCLUSIONS OF LAW

Under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 1402(b), 2401(b), 2402, 2671-2680 ("FTCA"), the Court has subject matter jurisdiction over Fallin's negligence claim against the United States. Nevada law applies to this claim. *See Louie v. United States*, 776 F.2d 819, 824 (9th Cir. 1985); 28 U.S.C. §§ 1346(b)(1), 2674. Under Nevada law, to prove negligence, a plaintiff must show that: (1) the defendant had a duty to exercise due care towards the plaintiff; (2) the defendant breached the duty; (3) the breach was the actual and proximate cause of plaintiff's injury; and (4) the plaintiff incurred damages. *Lawrence v. Las Vegas Metro. Police Dep't*, 451 F. Supp. 3d 1154, 1172 (D. Nev. 2020); *Perez v. Las Vegas Med. Ctr.*, 805 P.2d 589, 590-91 (Nev. 1991).

### A. Duty

In Nevada, courts determine duty by deciding whether "such a relation exists between the parties that the community will impose a legal obligation upon one for the benefit of the other." *PHWLV, LLC v. House of CB USA, LLC*, 554 P.3d 715, 719 (Nev. 2024) (citing *Lee v. GNLV Corp.*, 22 P.3d 209, 212

(Nev. 2001)). Duty is a question of law. *Lee*, 22 P.3d at 212. Vehicle drivers "are under a twofold duty" that includes both compliance with traffic laws and to "exercise the care of the ordinarily prudent person under the circumstances." *Johns v. McAteer*, 85 Nev. 477, 483 (1969); *accord Glover-Armont v. Cargile*, 134 Nev. 361, 362 (Nev. App. 2018). Barnes and Fallin both had a duty to exercise the care of an ordinarily prudent driver.

### B. Breach

Whether a defendant breached their duty of care is a question of fact. *PHWLV*, 554 P.3d at 720 (citing *Lee*, 22 P.3d at 212). If a defendant asserts comparative negligence as a defense, the trier of fact must find the relevant percentage of fault of the parties and award damages according to that percentage. N.R.S. 41.141; *Café Moda v. Palma*, 128 Nev. 78, 80 (2012).

Tyler Barnes, acting in his capacity as an employee of Defendant United States, breached his duty to Fallin by failing to yield to Fallin's right of way. Fallin, who was traveling around the speed limit and attempted to slow down upon seeing Barnes turn, did not breach his duty to Barnes. Applying the law to the facts, for the reasons discussed in the Findings of Fact, the Court finds Barnes 100% at fault.

### C. Causation

To establish causation, a plaintiff must prove that their damages were actually and proximately caused by the defendant's breach. *See Goodrich & Pennington Mortg. Fund, Inc. v. J.R. Woolard, Inc.*, 101 P.3d 792, 797 (Nev. 2004) (citing *Dow Chemical Co. v. Mahlum*, 970 P.2d 98, 107 (Nev. 1998)). Actual cause is but-for causation. Proximate cause "limits a defendant's liability to foreseeable consequences that have a reasonably close connection with both the defendant's conduct and the harm which that conduct created" (i.e., conduct "produces the injury complained of and without which the result would not have occurred"). *Id.* Medical expert testimony regarding causation

1    must be stated to a reasonable degree of medical certainty. *See Morsicato v.*
2    *Sav-On Drug Stores, Inc.*, 111 P.3d 1112, 1116) (Nev. 2005).

3    Under Nevada law, a tortfeasor is "liable for any physical injury" it
4    causes, "no matter how unforeseeable," once it inflicts "harm on a plaintiff's
5    body." *Gibson v. Cnty. of Washoe, Nev.*, 290 F.3d 1175, 1192 (9th Cir. 2002),
6    *overruled on other grounds by Castro v. Cnty. of Los Angeles*, 833 F.3d 1060
7    (9th Cir. 2016); *see also Matlock v. Greyhound Lines, Inc.*, No. 2:04-CV-0051-
8    KJD-GWF, 2010 WL 3171262, at *5 (D. Nev. Aug. 10, 2010). Applying the law
9    to the facts, as discussed *supra* 1.B.2, 1.B.C, the Court concludes that Fallin's
10   injuries were actually and proximately caused by the accident.

11   **D. Damages**

12   A successful tort plaintiff is entitled to compensation for all the natural
13   and probable consequences of the tortfeasor's breach. *Lerner Shops of Nev., Inc.*
14   *v. Marin*, 423 P.2d 398, 401 (Nev. 1967). Compensatory damages awards are
15   reasonable under Nevada law if they are supported by substantial evidence,
16   and they are not "given under the influence of passion or prejudice" or
17   otherwise shock the conscience. *Wyeth v. Rowatt*, 244 P.3d 765, 782 (Nev.
18   2010) (internal citations omitted).

19   **1. Past Medical Damages**

20   As the Government only contests Fallin's medical damages after April 26,
21   2021, the Court only considers these damages. (*See* ECF No. 57 at 156, 160.)
22   The Government contends that Fallin must show that both past and future
23   damages must be medically necessary and reasonably related to the accident.
24   (*See id.* at 160:3.) Fallin argues that even if past treatment was contraindicated
25   or the result of negligent diagnosis or treatment, it still must be compensated if
26   it was causally related to the accident. (*Id.* at 162.)

27   Contrary to the Government's position, under Nevada law, a plaintiff
28   need only show that past medical damages were the "natural and probable

13

1  consequences of the tortfeasor's breach," while future medical damages require
2  a plaintiff to show that treatment is "reasonably necessary." *Compare Hall v.*
3  *SSF, Inc.*, 930 P.2d 94, 97 (Nev. 1996) *and Lerner*, 423 P.2d at 401. This is
4  because Nevada's "well-settled law" holds "that the original tortfeasor is liable
5  for the malpractice of the attending physicians." *Republic Silver State Disposal*,
6  478 P.3d at 365 (citing *Hansen v. Collett*, 380 P.2d 301, 304 (Nev. 1963);
7  Restatement (Second) of Torts § 457). An attending physician may commit
8  malpractice by providing inappropriate treatment or an inappropriate
9  diagnosis. *See Szymborski v. Spring Mountain Treatment Ctr.*, 403 P.3d 1280,
10  1284, 1286 (Nev. 2017) (malpractice includes claims of negligent diagnosis and
11  treatment). Inappropriate treatment and diagnoses are never reasonably
12  necessary. Applying the "reasonably necessary" standard to past medical
13  damages would therefore allow an original tortfeasor to avoid liability for
14  medical malpractice arising out of an accident, contrary to Nevada law.

15        The Court finds that Fallin received a discogram as a part of his medical
16  treatment for the injuries he suffered because of the 2021 accident. The fact
17  that the discogram is a controversial procedure does not affect Fallin's
18  damages, since the relevant standard is whether the procedure performed on
19  Fallin was the natural and probable consequence of Fallin's injuries. The
20  precedential cases the Government cites do not dispute this view, and instead
21  disallow damages based on credibility findings about damages. *See Quintero v.*
22  *McDonald*, 14 P.3d 522, 524 (Nev. 2000) (upholding jury verdict finding liability
23  but no damages because "a reasonable jury could have disbelieved Quintero's
24  testimony concerning her alleged pain and suffering and . . . inferred that she
25  was not injured as a proximate result of the accident"); *Fox v. Cusick*, 533 P.2d
26  466, 468 (upholding jury verdict finding liability without damages on basis that
27  jury believed that defendant either did not proximately cause accident or
28  plaintiffs did not "truly sustain personal injuries as a result of the collision");

14

1    *Hall*, 930 P.2d at 97 (stating standard for future medical damages).

2          Accordingly, the Court concludes that Fallin's medical treatment,

3    including treatment after April 26, 2021, were natural and probable

4    consequences of the accident.

5          **2. Future Medical Damages**

6          A plaintiff must show that future medical expenses are "reasonably

7    necessary" and supported by substantial evidence. *See Wilson v. Biomat USA,*

8    *Inc.*, No. 2:10-cv-1657-GMN-RJJ, 2011 U.S. Dist. LEXIS 126853, at *6 (D. Nev.

9    Oct. 31, 2011) (citing *Hall*, 930 P.2d at 97). The Court holds that testimony

10   from Dr. Rappaport and Fallin's treating physicians justifying the two Selective

11   Nerve Root Block and Sympathetic Branch Root Block constituted substantial

12   evidence that such treatments are reasonably necessary.

13         **3. Pain and Suffering**

14         Because of the subjective nature of pain and suffering, "a determination

15   of their monetary compensation falls peculiarly within the province" of the

16   finder of fact. *Stackiewicz v. Nissan Motor Co.*, 686 P.2d 925, 932 (Nev. 1984);

17   *See also Harrah's Laughlin, Inc. v. Swanson*, 129 Nev. 1121 (2013)

18   (unpublished disposition) (rejecting "analogous award" and "multiples test" for

19   calculating pain and suffering damages). Applying the law to the facts, the

20   Court holds that an amount equal to two times Fallin's special medical

21   damages and economic damages would sufficiently and not overly compensate

22   Fallin for his pain and suffering incurred in the years following the accident.

23         **4. Economic Damages**

24         Because Mr. Partin's report relies on assumptions that the Court does

25   not agree with, and because Mr. Simms was qualified as an expert and testified

26   credibly as to his methodology and conclusions regarding Fallin's lost wages,

27   the Court adopts Simms's report for Fallin's economic damages.

28

**5. Summary of Damages**

Based on the foregoing, the Court concludes that Defendant's negligence resulted in Plaintiff's damages as detailed above in the amounts of $219,539.88 in medical special damages, $17,600 in future medical damages, $614,127.76 in general damages for pain and suffering, and $69,934 for loss of wages, totaling $921.191.64.

## IV.    CONCLUSION

THEREFORE, in light of the foregoing Findings of Fact and Conclusions of Law,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED that Judgment is entered against Defendant and in favor of Plaintiff.

IT IS FURTHER ORDERED, ADJUDGED, and DECREED that Plaintiff is awarded damages in the amount of $921,191.64.


DATED THIS 9th day of September, 2025.


_____
ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE